## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

————————————————————  )
STUDIO METHOD, LLC d/b/a          )
STUDIO NANTUCKET,                 )
                                  )
     Plaintiff and Counterclaim   )
     Defendant,                   )     **Civil Action No.**
                                  )     **21-11763-FDS**
     v.                           )
                                  )
NANTUCKET STUDIO, LLC and         )
VINCENT PIZZI,                    )
                                  )
     Defendants and Counterclaim  )
     Plaintiffs.                  )
————————————————————  )

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**SAYLOR, C.J.**

This is a trademark infringement case. Plaintiff Studio Method, LLC d/b/a Studio Nantucket, is a fitness studio located on Nantucket. It opened for business in 2016. Nantucket Studio, LLC is a brand-marketing and digital-design agency with an office on Nantucket. It was founded by Vincent Pizzi in 2019.

Studio Nantucket has filed suit against Pizzi and Nantucket Studio for trademark and trade-dress infringement, false designation of origin, and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a), and infringement under Massachusetts statutory and common law. It has also asserted a claim under Mass. Gen. Laws ch. 93A. The complaint generally alleges that defendants' trademark, logo, and website are confusingly similar to its own, in violation of its trademark rights.

Defendants have moved for summary judgment on all counts. It is true, of course, that

the relevant marks—Studio Nantucket and Nantucket Studio—are identical, other than word order.  Nonetheless, and as set forth below, the Court finds that the mark "Studio Nantucket" is descriptive, and not inherently distinctive; that the trade dress likewise is not inherently distinctive; that neither the mark nor dress have acquired secondary meaning; and that there is a low likelihood of consumer confusion.  Among other things, because the parties sell unrelated services in different channels of trade to distinct classes of consumers, there is little chance that any consumer would experience any meaningful degree of confusion as to the origin of those services.  Accordingly, and for the following reasons, the motion will be granted.

## I.   Background

### A.   Factual Background

The following facts are undisputed except as noted otherwise.

#### 1.   Studio Nantucket

Studio Method, LLC, d/b/a Studio Nantucket, is a fitness studio located in the commercial center of Nantucket.  (Dkt. No. 30, Exs. 1, 9).  It opened in 2016 and is one of fewer than 150 retail businesses on the island.  (Dkt. No. 27, Ex. A ("M. Swift Dep.") at 18; Dkt. No. 30, Ex. 6).  Studio Nantucket provides physical-fitness instruction, studio services, and fitness and exercise facilities.  (Dkt. No. 27, Ex. D ("Pl.'s Interr. Resp.") No. 3).  It also sells branded apparel and goods, although its main source of income is through its fitness offerings.  (Dkt. No. 27, Ex. B ("Studio Nantucket Dep.") at 33).  The studio has earned more than $1 million from its services and goods since its opening.  (P. Swift Aff. ¶ 12).

Studio Nantucket utilizes the mark STUDIO NANTUCKET in connection with its services and goods.  (Amend Compl. ¶ 11).  Its owner and operator, Meaghan Swift, chose the mark around 2015, and first used it in commerce around April 2016.  (M. Swift Dep. at 18, 44; Pl.'s Interr. Resp. No. 20).  According to Swift, she chose STUDIO NANTUCKET because she

wanted a name that described "a place where all fitness could happen" without having "Barre or Boot Camp or Reformer X in the name." (M. Swift Dep. at 45-46).[1] She defined the term "studio" as "[a] place where people create things" and "the name of the place where you work out," and stated that she chose to include the word "Nantucket" to indicate that her business was "in the heart of Nantucket." (*Id.* at 46-47).

Studio Nantucket has not applied to the United States Patent and Trademark Office for trademark protection. (Studio Nantucket Dep. at 31; Dkt. No. 27, Ex. D ("Pl.'s Resp. to Req. for Admis.") No. 2). However, it is the owner of two Massachusetts trademark registrations. Registration No. 89322 (issued July 13, 2020) is a service mark registered in connection with physical fitness instruction and studio services, while Registration No. 89407 (issued August 6, 2020) is a trademark registered in connection with use on clothing and other goods, such as water bottles. (Dkt. No. 30, Exs. 15-16).

In addition to the STUDIO NANTUCKET word mark, Swift and a brand-design professional created a stylized logo and color palette, which are used in connection with both Studio Nantucket's physical studio and online presence. (M. Swift Dep. at 44-45; Studio Nantucket Dep. at 26-27; Amend. Compl. ¶¶ 14-15).



The Studio Nantucket website uses the logo and color palette and contains the language "Nantucket's Premier Fitness Studio." (Dkt. No. 27, Ex. G). The website provides information on the classes offered and the studio's instructors, and links for clients to reserve classes. (*Id.*).

---

[1] Barre, Boot Camp, and Reformer X are apparently types of exercise classes.

Studio Nantucket advertises its business by word-of-mouth, apparel sales, online search engines (including Google Ads), social media, and direct mail, among other methods.  (Studio Nantucket Dep. at 34-35; Pl.'s Resp. to Interr. No. 5).  A Studio Nantucket representative testified at its Rule 30(b)(6) deposition that it does "a lot of online advertising" because it "see[s] that people that are coming to the island are sometimes looking on the internet for a place to work out."  (Studio Nantucket Dep. at 34).  Its advertising efforts increase in the summer months, when "there's more traffic" on the island.  (M. Swift Dep. at 48-49).  Its advertising is handled by Swift's husband, Parker Swift.  (M. Swift Dep. at 12, 49).  Studio Nantucket has spent "at least" $34,211 in internet-advertising expenses and $15,000 in website-development expenses since its inception, and approximately $20,000 per year on branded retail items.  (Dkt. No. 27, Ex. F; P. Swift Aff. ¶¶ 13-14).  Parker Swift has estimated that the value of his contribution in developing and promoting the Studio Nantucket brand is about $250,000.  (P. Swift Aff. ¶ 17).

Studio Nantucket has received media coverage in local magazines, a television news series, and travel blogs.  (Dkt. No. 32, Ex. 7 ("M. Swift Aff.") ¶ 9; Dkt. No. 32, Ex. 10).

### 2.   <u>Nantucket Studio</u>

Nantucket Studio is a full-service brand-marketing and digital-design agency.  (Dkt. No. 27, Ex. G ("Defs.' Resp. to Interr.") No. 9).  Vincent Pizzi is its founder and sole owner.  (Dkt. No. 27, Ex. G ("Defs.' Resp. to Req. for Admis.") No. 10).  Nantucket Studio has locations in Boston, Nantucket, and Waltham.  (Dkt. No. 27, Ex. I).  It advertises to businesses using paid keyword search terms.  (Dkt. No. 27, Ex. H).

Nantucket Studio conducts business under the brand name and mark NANTUCKET

STUDIO.  (Defs.' Resp. to Interr. No. 8).[2]  Pizzi selected that mark when he launched his business in early 2019.  (*Id.*).  Pizzi apparently began freelance work on the business around 2015.  (Dkt. No. 33).  Defendants have not sought trademark protection at either the federal or state level.  (Defs.' Resp. to Interr. No. 8).  Pizzi states that he was unaware of the STUDIO NANTUCKET brand name at the time the NANTUCKET STUDIO name was created.  (*Id.*).

Nantucket Studio also produces branded clothing items and coffee mugs.  (Dkt. No. 30, Exs. 17, 19).  It is unclear whether it sells those items to the public.  At least some Nantucket Studio clothing bears the phrase "Est. 2015," while Studio Nantucket's clothing includes "Est. 2016."  (*Id.*, Ex. 17).

Nantucket Studio uses a stylized logo containing the NANTUCKET STUDIO name and a tri-color palette in connection with its services and website.  (Amend. Compl. ¶¶ 34-36; Ans. ¶¶ 34-36).[3]



Nantucket Studio's website describes its business as "a full-service branding, marketing, and digital design agency committed to helping your business stand out on-island and beyond."  (Amend. Compl., Ex. L).  The website also contains information about Nantucket Studio and its leadership, services, and recent projects.  (*Id.*, Exs. L & M; Dkt. No. 27, Ex. K).  At least one of the recent projects features graphic design work performed for Nantucket Health Club, which

---

[2] Defendants contend that Nantucket Studio is a brand name rather than a trademark because it is generic in nature.  (Defs.' Resp. to Interr. No. 8).

[3] Defendants' Statement of Facts cites to an exhibit containing a different logo and color scheme.  (Defs.' SOF ¶ 35 (citing Ex. J)).  However, the Statement of Facts itself includes the logo and color scheme included above.  (Defs.' SOF ¶ 37).

plaintiff contends is a competitor.  (Amend. Compl. ¶ 44, Ex. L).

### 3.  Allegations of Consumer Confusion

Studio Nantucket has identified three examples of alleged consumer confusion occurring in June 2020.  (Pl.'s Resp. to Interr. No. 14).  First, a client of Studio Nantucket asked Meaghan Swift if the business had purchased a new vehicle, because he "had seen a vehicle driving in the area of Plaintiff's establishment that appeared to be branded with a Studio Nantucket logo."  (*Id.*; *see also* M. Swift Dep. at 51).  Second, another client stated that she had been contacting Studio Nantucket through its website and wanted to know why she was not receiving a response.  (Pl.'s Resp. to Interr. No. 14; Dkt. No. 30, Ex. 22).  It was later discovered that she "had been attempting to contact Studio Nantucket via the nantucketstudio.com website" without realizing that they were different businesses.  (*Id.*).  Third, an employee of Studio Nantucket saw "on two separate occasions . . . a vehicle with what appeared to be a Studio Nantucket logo parked on Federal Street in front of the Studio Nantucket building but which was actually a vehicle belonging to Defendants."  (*Id.*).  Studio Nantucket states that there have been numerous other examples of consumers accidentally contacting Nantucket Studio or accessing nantucketstudio.com when they intended to contact Studio Nantucket, although it provides no further details.  (*Id.*).

According to a Google Ads Report produced by defendants, "studio Nantucket" is one of the top search terms that produces Nantucket Studio's advertisement in the results.  (Dkt. No. 32, Ex. 21).  Defendants' advertisement appeared in 797 searches using the search term "studio Nantucket," and 58 of those impressions resulted in someone clicking on the advertisement.  (*Id.*; *see also* Ex. 18 (Google search result for "studio Nantucket" showing Nantucket Studio advertisement)).

B.      **Procedural Background**

The complaint, as amended, asserts five counts against Nantucket Studio and Pizzi:  (1) false designation of origin and unfair competition by Nantucket Studio in violation of 15 U.S.C. § 1125(a); (2) false designation of origin and unfair competition by Pizzi in violation of 15 U.S.C. § 1125(a); (3) trademark infringement by Nantucket Studio under Mass. Gen. Laws ch. 110H, § 14 and Massachusetts common law; (4) trademark infringement by Pizzi under Mass. Gen. Laws ch. 110H, § 14 and Massachusetts common law; (5) unfair methods of competition and/or unfair or deceptive acts or practices under Mass. Gen. Laws ch. 93A, § 11.[4]

Defendants have asserted counterclaims for (1) a declaratory judgment that the trademark and trade dress asserted by plaintiff are not protectable and (2) cancellation of plaintiff's Massachusetts trademark registrations.

Defendants have moved for summary judgment on all five counts of the amended complaint.

II.     **Legal Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most

---

[4] Defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) on the grounds that plaintiff had no protectable rights in its mark under the Lanham Act, 15 U.S.C. § 1125(a), that the court should decline to exercise jurisdiction over the remaining state law claims, and that the claims against Pizzi should be dismissed for failure to allege grounds for piercing the corporate veil.  That motion was found to be moot after plaintiff filed its amended complaint.

flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III.    <u>Defendants' Motion for Summary Judgment on the Trademark Claims</u>

Defendants have moved for summary judgment on the claims of false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a) (Counts 1 and 2), and trademark infringement under Mass. Gen. Laws ch. 110H, § 14 and Massachusetts common law (Counts 3 and 4).

Section 43(a) of the Lanham Act provides a cause of action for infringement of trademarks that are not registered with the United States Patent Office.  15 U.S.C. § 1125(a). That statute protects against the use in commerce by any person of "any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive" as to the source of the product.  15 U.S.C. § 1125(a)(1)(A).  A plaintiff seeking to establish claims for infringement of an unregistered mark under the Lanham Act must show "both that its mark merits protection and that the allegedly infringing use is likely to result in consumer confusion." *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112,

116 (1st Cir. 2006).[5]

### A.    Protection Under the Lanham Act

Defendants first contend that plaintiff's unregistered mark and trade dress are not entitled to protection.

For a mark to be protected, it must be distinctive.  *See Borinquen*, 443 F.3d at 116; *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992).  In determining whether a mark is distinctive, "courts often employ a taxonomy that classifies marks along a continuum of increasing distinctiveness" containing five categories:  generic, descriptive, suggestive, arbitrary, and fanciful.  *Borinquen*, 443 F.3d at 116.  Suggestive, arbitrary, and fanciful marks are considered inherently distinctive; by contrast, generic marks can never be distinctive.  *Id.* "Descriptive marks are tentatively considered non-distinctive but can attain distinctive status upon an affirmative showing of secondary meaning."  *Id.*

Defendants contend that plaintiff's mark and dress are not inherently distinctive and have not acquired secondary meaning.

### 1.    Whether the "STUDIO NANTUCKET" Mark Is Entitled to Protection Because of Its Massachusetts Registration

As an initial matter, plaintiff argues that the "STUDIO NANTUCKET" mark and trade dress are entitled to protection because of their Massachusetts trademark registrations.  Under Mass. Gen. Laws ch. 110H, § 5, state registration of a mark serves as "prima facie evidence of the registrant's exclusive right to use the registered mark in this commonwealth on goods or services specified in the registration."  Where state law indicates that registration is *prima facie*

---

[5] "In Massachusetts, the test for common law trademark infringement is the same as under the Lanham Act."  *United Oil Heat, Inc. v. M.J. Meehan Excavating, Inc.*, 95 Mass. App. Ct. 579, 581-82 (2019); *L&P Bos. Operating, Inc. v. Window Nation, LLC*, 626 F. Supp. 3d 461, 467 (D. Mass. 2022).  Accordingly, the Court will not analyze plaintiff's state law trademark claims separately.

evidence of ownership and validity, "[t]he burden is on the challenger to rebut the presumption of validity."  3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 22:1 (5th ed.).

It is not clear what effect a Massachusetts trademark registration has on claims brought under the Lanham Act in federal court.  The First Circuit has recognized that the presumption of validity applies where a mark is federally registered, *see Equine Techs., Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 545 (1st Cir. 1995), but has not taken a view on whether the presumption applies to state registrations, *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 16 (1st Cir. 2012).[6]  Nevertheless, it has upheld a district court's finding that there was sufficient evidence to rebut such a presumption, assuming it applied.  *See Peoples Fed. Sav. Bank*, 672 F.3d at 16.  Specifically, evidence that another bank had registered a similar mark before the plaintiff and that other banks in the area had used similar marks was sufficient to show a lack of secondary meaning.  *Id.*[7]

In any case, and as set forth below, the Court concludes that even if the presumption of validity were to apply to plaintiff's mark for purpose of the claims brought under the Lanham

---

[6] The Lanham Act provides that registration of a mark by the PTO on the Principal Register "shall be prima facie evidence of the validity of the registered mark . . . and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration."  15 U.S.C. § 1115(a).  A challenger can rebut that presumption through proof that the mark is merely generic or that it is descriptive.  *Peoples Fed. Sav. Bank v. People's United Bank*, 750 F. Supp. 2d 217, 222 (D. Mass. 2010).  The burden of persuasion then shifts back to the trademark holder, who must prove that the mark has established secondary meaning.  *Bay State Sav. Bank v. Baystate Fin. Servs., LLC*, 484 F. Supp. 2d 205, 213 (D. Mass. 2007).

[7] Defendants contend that plaintiff should be judicially estopped from arguing that defendants' mark is confusingly similar where plaintiff represented in its application to the Commonwealth that it knew of no other person who had registered or had the right to use confusingly similar marks.  (Defs.' Reply at 2-3).  Swift contacted defendants to contest their use of the mark eleven days before filing for Massachusetts registration on June 23, 2020, and therefore knew of defendants' mark prior to registration.  However, plaintiff's statements to the Commonwealth and its position in this case are not "directly inconsistent."  *See Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004).  Its infringement claims are based on the premise that defendants do not possess the right to use the Studio Nantucket mark, which is consistent with the representation that it knew of no other person with the right to use a similar mark.  Therefore, plaintiff is not estopped from raising an infringement argument here.

Act, defendants have provided sufficient evidence to rebut the presumption of validity, and plaintiff has failed to make a showing of secondary meaning.

### 2.    Whether the "STUDIO NANTUCKET" Mark Is Inherently Distinctive

The next question is whether the STUDIO NANTUCKET mark is inherently distinctive.

Defendants first assert that "studio" is a generic term and therefore not entitled to protection. Generic terms are those that "have passed into common usage to identify a product." *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 180 (1st Cir. 1993) (aspirin is a generic term). Their "'primary significance . . . to the relevant public' is as an identifier of the nature of a good, rather than its source." *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 18 (1st Cir. 2008) (quoting *Colt Def. LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 705 (1st Cir. 2007)). In determining the primary significance of a term, courts ought to consider "(1) consumer surveys; (2) the use of the term in media publications, (3) use of the term by competitors in the industry; (4) purchaser testimony concerning the term; and (5) the plaintiff's use of the term." *Id.* The burden of proof is on the party seeking to have a mark declared generic. *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 27 (1st Cir. 1989).

Here, the only evidence presented by defendants that the mark is generic is testimony by Megan Swift that "studio" refers to "the name of the place where you work out," and that "everyone" calls a fitness studio a studio. (M. Swift Dep. at 46-47). The plaintiff's use of the term is, by itself, insufficient to indicate the primary significance of the term to consumers or the public. It is true that "studio" can refer to different types of businesses—including art studios, recording studios, and design studios—in addition to fitness studios. However, without further evidence demonstrating how consumers, the media, or competitors use the term, the Court declines to conclude that the mark is generic.

11

Instead, the Court concludes that plaintiff's mark falls within the descriptive category. Marks are descriptive when they convey "an immediate idea of the ingredients, qualities or characteristics of the goods" to which they refer. *Boston Duck Tours*, 531 F.3d at 13 (quoting *Equine Techs., Inc.*, 68 F.3d at 544). Accordingly, when a mark describes a characteristic of a product without identifying its source, it is merely descriptive and not inherently distinctive. *Two Pesos*, 505 U.S. at 769. Here, the term "studio" functions primarily to identify the type of services that plaintiff offers. Similarly, "Nantucket" identifies the location of plaintiff's business. (*See* M. Swift Dep. at 46 (noting that she used the term to refer to the fact that the business is located "in the heart of Nantucket")). The combination of a geographic term with another term, without more, is not sufficient to render a mark inherently distinctive. *See Marie-Binucci v. Adam*, 907 F. Supp. 29, 31 (D. Mass. 1995) (concluding that "Monaco" is a geographic term, and therefore descriptive); *Boustany v. Boston Dental Grp., Inc.*, 42 F. Supp. 2d 100, 106 (D. Mass. 1999) ("[W]hen a geographic term 'is used merely to indicate the location or origin of goods and services,' it is not protected because it is functioning in a purely descriptive manner.").

Nor does the supposedly unusual ordering of the terms suggest distinctiveness; regardless of the order in which the terms appear, the mark simply identifies the services provided and the location of those services. Finally, plaintiff makes much of the fact that the mark refers only to a segment of its business and does not encompass its sale of clothing and other merchandise; according to plaintiff, that renders the mark suggestive. However, "a service mark which indicates less than all the activities of its proprietor may still be descriptive." 3 LOUIS ALTMAN, CALLMAN ON UNFAIR COMP., TRADEMARKS AND MONOPOLIES § 18:15 (4th ed.). Studio fitness

classes, not apparel, make up the bulk of plaintiff's revenue, and the branded merchandise serves principally, if not entirely, as a form of advertising for those services.

In sum, plaintiff's mark is descriptive, and therefore not inherently distinctive.

### 3.  Whether the Studio Nantucket Trade Dress Is Inherently Distinctive

"The Lanham Act extends protection not only to words and symbols, but also to 'trade dress,' defined as 'the design and appearance of a product together with the elements making up the overall image that serves to identify the product presented to the consumer.'" *Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 37-38 (1st Cir. 2001) (quoting *Chrysler Corp. v. Silva*, 118 F.3d 56, 58 (1st Cir. 1997)). Courts recognize trade dress claims based both on product packaging and on product design. *See Wal-Mart Stores v. Samara Bros., Inc.*, 529 U.S. 205, 213-14 (2000). In addition, "distinctive characteristics that are 'akin to product packaging' may be entitled to trade dress protection." *Smartling, Inc. v. Skawa Innovation Ltd.*, 358 F. Supp. 3d 124, 145 (D. Mass. 2019) (quoting *Wal-Mart*, 529 U.S. at 215)). "[T]rade dress involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Gurglepot, Inc. v. New Shreve, Crump & Low LLC*, 153 F. Supp. 3d 441, 448 (D. Mass. 2015) (quoting *General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 414 (6th Cir. 2006)).

As an initial matter, "the burden to clearly identify the trade dress at issue is on the plaintiff." *Yankee Candle*, 259 F.3d at 40 n.9. According to the amended complaint, the claimed trade dress includes the Studio Nantucket logo, a blue, grey, and cream color palette, and the "look and feel" of the studionantucket.com website, which consists of

> the STUDIO NANTUCKET mark in combination with the Studio Nantucket color palette, the website tab comprising the STUDIO NANTUCKET mark with an image of the island of Nantucket, and the look and feel of the website as embodied by the appearance and location of the STUDIO NANTUCKET stylized trademark, the incorporation of the Studio Nantucket color palette throughout the

13

website, and the array of menu boxes.

(Amend. Compl. ¶¶ 14-17).

For trade dress to be protected, "a plaintiff must prove that the dress is:  (i) used in commerce; (ii) non-functional; and (iii) distinctive."  *Yankee Candle*, 259 F.3d at 38.  Defendants do not dispute that the dress is used in commerce and non-functional.  Whether the trade dress is entitled to protection therefore depends on whether it is distinctive.  As with trade marks, the distinctiveness of trade dress may be either inherent or acquired through secondary meaning.  *Id.* Whether trade dress is inherently distinctive depends on whether it is a common shape or design, whether it is unique or unusual in its field, whether it merely refines a commonly-known form of ornamentation, or whether it is "capable of creating a commercial impression distinct from the accompanying words."  *Yankee Candle*, 259 F.3d at 42 (1st Cir. 2001) (quoting *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A. 1977)).

A single color can never be inherently distinctive, because it "does not 'almost *automatically* tell a customer that it refers to a brand' and does not 'immediately signal a brand or a product 'source.'"  *Wal-Mart*, 529 U.S. at 212 (alterations omitted) (quoting *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 162-63 (1995)).  Some courts have held that color combinations cannot be inherently distinctive, *see Black & Decker Corp. v. Positec USA Inc.*, 2015 WL 1543262, at *27 (N.D. Ill. Mar. 31, 2015) ("A color combination is not inherently distinctive but may have secondary meaning."), while others have held that a multi-color mark applied to product packaging can be inherently distinctive where consumers associate it with the source of the product, *see In re Forney Indus., Inc.*, 955 F.3d 940, 946 (Fed. Cir. 2020). Regardless of what test applies, plaintiff here has not provided evidence that the color combination is so unusual that it creates a unique commercial impression.  *See Seabrook Foods, Inc.*, 568 F.2d at 1344.  Therefore, plaintiff must show that it has acquired secondary meaning.

14

"[T]he First Circuit has not addressed whether the appearance of a website may constitute protectable trade dress."  *Smartling, Inc.*, 358 F. Supp. 3d at 145.  Some courts have considered a website to be "product design."  *Ingrid & Isabel, LLC v. Baby Be Mine, LLC*, 70 F. Supp. 3d 1105, 1137 (N.D. Cal. 2014) (noting the "conceptual similarity" between "look and feel" and "design").  According to the Supreme Court, design-based trade dress is only protectable upon a showing of secondary meaning.  *Wal-Mart*, 529 U.S at 215-216.  In any case, plaintiff has not shown that the "look and feel" of its website is inherently distinctive, such that the public would associate the website with its business.

In sum, neither plaintiff's color palette nor the look and feel of its website are inherently distinctive.

### 4.      <u>Whether the Mark and Dress Have Acquired Secondary Meaning</u>

Because plaintiff's mark and dress are not inherently distinctive, they are only protected if they had acquired secondary meaning by the time of the alleged infringement.[8]  Establishing secondary meaning "requires proof that 'in the minds of the public, the primary significance of [the mark or dress] is to identify the source of the product rather than the product itself.'"

---

[8] The Massachusetts trademark statute does not appear to protect descriptive marks that have acquired secondary meaning.  The remedial provision under Mass. Gen. Laws ch. 110H, § 14 applies only to registered marks.  And Mass. Gen. Laws ch. 110H, § 2(5)(ii) excludes from registration any mark that "when used on or in connection with the goods or services of the applicant, is merely descriptive," or "primarily geographically descriptive."  Unlike the Lanham Act, which excludes from protection marks that are "merely descriptive" *except* for those that have "become distinctive of the applicant's goods in commerce," 15 U.S.C. §§ 1052(e)-(f), the Massachusetts statute does not provide an exception for descriptive marks that have acquired distinctiveness.  *See L&P Bos. Operating, Inc.*, 626 F. Supp. 3d at 466 ("[I]t is plain from the terms of the statute that descriptive marks, except for surnames, are not entitled to trademark protection [under the Massachusetts trademark statute] regardless of any distinctiveness that they may have acquired.").  Accordingly, summary judgment on plaintiff's claims brought under Mass. Gen. Laws ch. 110H, § 14 may be granted on the basis that the marks are descriptive, without reaching the question of secondary meaning.

Plaintiff also asserts claims under Massachusetts common law.  "Whether a common-law trademark is protectible is determined by the same standard applicable to the federal Lanham Act."  *Id.* at 467.  And the Lanham Act protects descriptive marks that have acquired distinctiveness.  15 U.S.C. § 1052(f).  Therefore, the secondary-meaning analysis applies to plaintiff's common-law trademark claims, as well as the Lanham Act claims.

*Unleashed Doggie Day Care, LLC v. Petco Animal Supplies Stores, Inc.*, 828 F. Supp. 2d 384, 392 (D. Mass. 2010) (quoting *Borinquen*, 443 F.3d at 116). Secondary meaning may be established in a geographically descriptive mark "where the mark no longer causes the public to associate the goods with a particular place, but to associate the goods with a particular source." *Boston Beer*, 9 F.3d at 181. Similarly, establishing that trade dress has acquired secondary meaning "requires at least *some* evidence that consumers associate the trade dress with the source." *Yankee Candle*, 259 F.3d at 44.

Plaintiff bears the burden of proving its mark and dress have acquired secondary meaning according to "vigorous evidentiary requirements." *Boston Beer*, 9 F.3d at 181 (quoting *Perini Corp. v. Perini Construction*, 915 F.2d 121, 125 (4th Cir. 1990)). Where direct evidence does not establish secondary meaning, circumstantial evidence may be evoked. *Unleashed Doggie Day Care*, 828 F. Supp. 2d at 392. Among the factors courts generally look to in determining whether a term or mark has acquired secondary meaning are (1) the length or exclusivity of use; (2) the size or prominence of the plaintiff's enterprise; (3) the existence of substantial advertising by plaintiff; (4) the product's established place in the market; and (5) proof of intentional copying. *I.P. Lund Trading v. Kohler Co.*, 163 F.3d 27, 42 (1st Cir. 1998). "Customer survey evidence, while not required, is a valuable method of showing secondary meaning." *Id.*

Plaintiff has offered no direct evidence of secondary meaning in the form of customer surveys or affidavits and relies instead on circumstantial evidence. *See Unleashed Doggie Day Care,* 828 F. Supp. 2d at 392.

Plaintiff adopted the STUDIO NANTUCKET mark in 2015, and first used it in commerce in 2016. Defendants founded Nantucket Studio in 2019. Therefore, plaintiff used the mark exclusively for about three years, at least on the island of Nantucket. At minimum, that

16

fact establishes that the public had the opportunity to form an association between plaintiff's mark and dress and its business before defendants' business existed.  But "the length of use of a mark, without more, is not sufficient to show the kind of consumer association required to achieve secondary meaning." *Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab., Inc.*, 997 F. Supp. 2d 92, 105 (D. Mass. 2014).  Plaintiff also points to the fact that its business is located in the commercial center of Nantucket, is one of approximately 150 businesses on the island, and has earned more than $1 million from its fitness classes and from the sale of its goods.  Those facts indicate that plaintiff likely receives a fair amount of traffic and has had some level of commercial success.  However, they do not show that plaintiff's business is relatively more prominent or well-established than other Nantucket businesses—including other fitness studios—nor that its sales were driven by the trademark or trade dress.  2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:49 (5th ed.) ("Raw sales figures need to be put into context to have any meaning.").

In terms of advertising, plaintiff has spent approximately $32,000 on keyword advertising and $15,000 in website design expenses.  It has also spent an unknown amount on non-internet advertising—such as direct mailings, news media, public relations, print advertising, and signage—and about $20,000 per year on branded retail items.  Parker Swift estimates that the value of his contribution in developing and promoting the Studio Nantucket brand is about $250,000.

Evidence of advertising expenditures and effort, however, is not alone sufficient to demonstrate that the advertising left a "lasting impression" in consumers' minds.  *E.T. Browne Drug Co. v. Cococare Prod., Inc.*, 538 F.3d 185, 199 (3d Cir. 2008).  Plaintiff has not provided an estimate of the number of people reached by its advertising, nor how frequently its

advertisements are distributed.  *See Lyons*, 997 F. Supp. 2d at 105 (mailings, social media, listing

in a major directory, and speaking engagements were not "the type of pervasive and continuous

advertising scheme" probative of secondary meaning); *Unleashed Doggie Day Care*, 2011 WL

6812642, at *8  (finding that small business's print advertisement, telephone book listing, and

expenditures of around $5,500 per year on advertising were "insufficient to establish secondary

meaning").  Nor has it provided evidence that its advertising has resulted in the public

associating its mark or dress with its business.  *See Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581

F.3d 1138, 1146 (9th Cir. 2009) ("The true test of secondary meaning is the effectiveness of the

advertising effort." (quotation marks and citation omitted)).  Given the lack of evidence

demonstrating the extent and efficacy of their advertising methods, plaintiff has not met its

burden to show that "a significant quantity of the consuming public understand [its name and

mark] as referring exclusively to [plaintiff's business]."  *President & Trs. of Colby Coll. v. Colby

Coll.-N.H.*, 508 F.2d 804, 807 (1st Cir. 1975).

    Proof of intentional copying can also provide evidence that a mark has acquired

secondary meaning.  "[T]he relevant intent is not just the intent to copy, but to 'pass off' one's

goods as those of another."  *Yankee Candle*, 259 F.3d at 45.  Here, the only evidence of

intentional copying presented by plaintiff is that defendants included "Est. 2015" on some of

their branded sweatshirts.  According to plaintiff, that reveals an attempt by defendants to pass

off their business as being founded before Studio Nantucket.  However, even if that evidence

were sufficient to show intent, attempting to falsify the founding date of their business is

different from attempting to pass off their *goods or services* as those sold by plaintiff.

    The only evidence that directly indicates widespread consumer recognition are examples

of news coverage of plaintiff's business in online travel guides and magazine articles.  However,

several of the articles were published after 2019, making them irrelevant to the question of secondary meaning at the time of infringement.  And plaintiff has not provided evidence that the publicity—some of which appears on online blogs—reached a large audience or left a lasting impression.  *Unleashed Doggie Day Care*, 828 F. Supp. 2d at 392 (record contained no evidence that brochures and newspapers announcing award had reached enough members of the consuming public to create secondary meaning).

Considering all of the factors together, the Court concludes that plaintiff has not met the "vigorous evidentiary showing" required to prove its mark has acquired secondary meaning. *Yankee Candle*, 259 F.3d at 45.  And because plaintiff relies on the same evidence with respect to its trade dress, the Court also finds that the trade dress has not acquired distinctiveness.

### B.      Likelihood of Consumer Confusion

In light of the conclusion that plaintiff lacks a protectable interest in its mark and dress, it is not necessary to resolve whether it has shown a likelihood of consumer confusion. Nevertheless, the Court will address the issue for the sake of completeness.

The central question of the consumer-confusion inquiry is whether a consumer is likely to believe that plaintiff's products and services are in fact produced by defendants.  *Boston Beer*, 9 F.3d at 180.  For a claim of infringement to succeed, the allegedly infringing conduct must create "a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care."  *Boston Duck Tours,* 531 F. 3d at 12 (quoting *International Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196, 201 (1st Cir. 1996)).  Consumer confusion under the Lanham Act is not limited to protection against lost sales—lost goodwill and reputation are also relevant considerations.  *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 15 (1st Cir. 2004).

To determine whether there is a likelihood of consumer confusion of two competing

19

marks, the court must consider at least the following factors:

> [T]he similarity of the marks; the similarity of the goods; the relationship between the parties' channels of trade; the relationship between the parties' advertising; the classes of prospective purchasers; evidence of actual confusion; the defendants' intent in adopting its mark; and the strength of the plaintiff's mark.

*Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981).

"None of these factors is necessarily controlling, but all of them must be considered." *Star Fin. Servs., Inc. v. AASTAR Mortg. Corp.*, 89 F.3d 5, 10 (1st Cir. 1996).

### 1.   Similarity of Marks and Dress

When considering similarity of two marks, a court should consider the "sight, sound and meaning" of the marks. *Boustany*, 42 F. Supp. 2d at 108.  Moreover, when evaluating marks containing words, the type of letters used (script or block), the color and composition of the background upon which they appear, and the spelling of the words, are all important considerations. *Coca–Cola Co. v. Snow Crest Beverages*, Inc., 162 F.2d 280, 283-84 (1st Cir. 1947).  "[S]imilarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features." *Boston Duck Tours*, 531 F.3d at 24 (quoting *Pignons*, 657 F.2d at 487).

The marks of both parties include the words "studio" and "Nantucket," albeit in reversed order.  The similarity of the word marks therefore weighs in plaintiff's favor.

Visually, both marks include a thin border partially surrounding text on a white background.  However, in plaintiff's mark, "studio" is stacked above "Nantucket" and appears in a relatively larger font size, while the words in defendants' mark are arranged in linear form and appear in the same size and font.  Furthermore, defendants' mark appears to include an image of the island of Nantucket inserted in the border above the text.  "Even if elements of each party's mark overlap, or are visually similar, the marks as a whole may still create a distinct commercial

impression, especially if the similarities are limited to generic or descriptive elements." *Boston Duck Tours,* 531 F.3d at 29.  While the marks share several features, the visual similarity alone does not require a finding of likely confusion.

**Plaintiff's Mark**                          **Defendants' Mark**

   

There is less overlap between the parties' trade dress.  Both parties' websites clearly explain their services:  plaintiff's website includes images of exercise classes and the language "Nantucket's Premier Fitness Studio."  The direct-marketing materials also state that plaintiff offers "Barre, bootcamp, & Reformer-X," among other fitness classes.  Defendants' website features images of a laptop, cellphones, tablets, and other tech equipment, and describes the business as "a full-service branding, marketing, and digital design agency committed to helping your business stand out on-island and beyond."  While there is some similarity in color palette, the "total effect of the designation" makes clear the differences in services offered.  *Boston Duck Tours*, 531 F.3d at 29.  Ordinary consumers would likely immediately recognize that the websites are associated with distinct companies.

Accordingly, while there is some similarity between the parties' marks, this factor does not weigh strongly in plaintiff's favor with respect to its trade dress.

**2.      Similarity of Services**

Plaintiff offers fitness-related services, including workout classes and physical-fitness instruction.  Defendants offer brand marketing and digital-design services.  The parties operate in entirely separate fields and do not compete, reducing the likelihood that consumers would be confused by their marks or trade dress.  *Cue, Inc. v. Gen. Motors LLC*, 2016 WL 4074134, at *6

(D. Mass. July 29, 2016) (concluding that plaintiff's home radios and speakers were highly dissimilar from defendant's cars with computer interfaces, weighing against a finding of consumer confusion).

The fact that both parties offer goods and apparel bearing their names does not change that analysis.  Neither party operates primarily in the apparel industry.  It is not apparent that defendants even sell branded goods to consumers, rather than producing them for employees—the only evidence plaintiff provides of defendants' apparel comes from photographs of Pizzi on the "About Nantucket Studio" page of defendants' website.  (Dkt. No. 27, Ex. M).   In any case, at least some of the branded apparel clearly states the respective services offered by the parties, which mitigates the likelihood of consumer confusion.[9]

Plaintiff also points to a page on defendants' website depicting graphic-design work that Nantucket Studio performed for another fitness studio as evidence that defendants "promote services that directly correspond to those offered by Plaintiff."  (Pl.'s Opp'n at 16).  In context—specifically, the fact that the page appears in a list of defendants' "recent projects"—no reasonable consumer would conclude from the website that defendant itself offers fitness services.

This factor therefore weighs heavily in favor of defendants.

> **3.**     **Relationship Between the Parties' Channels of Trade, Juxtaposition of Advertising, and Classes of Prospective Purchasers**

Channels of trade, channels of advertising, and prospective purchasers are frequently considered together, and the Court will do so here.  *See Pignons*, 657 F.2d at 488; *Copy Cop, Inc. v. Task Printing, Inc.*, 908 F. Supp. 37, 45 (D. Mass. 1995).

---

[9] Plaintiff's clothing includes the words "Barre," "Bootcamp," and "Yoga" on the back, whereas defendants' clothing includes the phrase "Marketing and Design."  (Dkt. No. 32, Ex. 17).

Defendants' customers are companies and organizations seeking web-design and marketing services. The fact that defendants have offices in Waltham and Boston indicates that they target consumers beyond Nantucket. And defendants presumably deliver their branding and web-design services to consumers online. Plaintiff's customers, on the other hand, are individuals seeking fitness instruction. While plaintiff's customer base includes visitors to Nantucket as well as residents, its services are delivered in person.[10] The parties therefore target different classes of prospective buyers and operate through different channels of trade.

Both parties use the internet and social media to advertise their services, including through paid keyword search terms using Google Ads.[11] But because the internet is widely used to advertise goods and services, the mere fact that "the goods or services of the parties are both found on the Internet proves little, if anything, about the likelihood that consumers will confuse similar marks used on such goods or services." 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:53.50 (4th ed. 2004). More persuasive for plaintiff's position is the fact that Google searches for "Studio Nantucket" often produce defendants' advertisements in the results. (Dkt. No. 32, Exs. 18, 21). The juxtaposition of the parties' advertisements online therefore increases the risk of consumer confusion to some degree. However, as noted above, the parties' websites clearly differentiate the services offered by each business.

In sum, while there is some overlap in the parties' advertising methods, the fact that the

---

[10] Consumer sophistication can conceivably "ameliorate confusion." *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 40 (1st Cir. 2006); *see also Cue, Inc.*, 2016 WL 4074134 at *6 ("[H]aving customers generally characterized as sophisticated and products that are relatively expensive tends to mitigate any likelihood of confusion."). While defendants suggest that plaintiff's "target consumers are presumably wealthy, sophisticated vacationers on Nantucket Island," it presents no evidence to support that claim. Therefore, the Court will not consider that element of this factor.

[11] Plaintiff also advertises locally by way of direct mail (flyers) and word of mouth; those forms of advertising are unlikely to lead to confusion, in part because they are targeted to individuals who are likely to have some familiarity with plaintiff's physical location.

parties do not share a customer base and deliver their services through different channels substantially mitigates the likelihood that a reasonable consumer would confuse one party's business for the other.

### 4.     Evidence of Actual Confusion

Proof of actual confusion, although not necessary to prevail on an infringement claim, "is often taken to be the most persuasive possible evidence that there is a likelihood of confusion." *Boustany*, 42 F. Supp. 2d at 110. Confusion may occur when a buyer "purchase[s] one product in the belief she was buying another and is thus potentially prevented from obtaining the product she actually wants." *Star Fin. Servs., Inc.*, 89 F.3d at 9. The confusion need not cause lost sales, however, or even involve actual or potential purchasers. *Beacon Mut. Ins. Co.*, 376 F.3d at 15. Instead, "actual confusion is commercially relevant if the alleged infringer's use of the mark 'could inflict commercial injury in the form of . . . a diversion of sales, damage to goodwill, or loss of control over reputation' on the trademark holder." *Id.* at 15 (quoting *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 963 (2d Cir. 1996)).

Here, plaintiff has provided evidence that an existing customer and an employee were confused about whether plaintiff had purchased a new car when they saw a vehicle bearing a sticker with defendants' logo parked near plaintiff's business. There is no evidence, or reason to infer, that those occurrences harmed defendants' reputation or diverted any sales. The other reported occurrence of actual confusion involved an existing customer attempting to contact plaintiff through its website and sending a message to defendants' website instead.[12] That customer attested that she "was confused and felt misled" when she was unable to book a class

---

[12] Megan Swift attests that there have been multiple additional instances of consumer confusion—including consumers contacting the wrong website—since June 2020, but provides no details on those occurrences. (M. Swift Aff. ¶ 19).

or find the information she wanted.  (Dkt. No. 30, Ex. 22).  While damage to goodwill can contribute to a finding of actual confusion, a single isolated example is not sufficient to show that an "appreciable number" of consumers were confused.  *International Ass'n of Machinists*, 103 F.3d at 201.

Plaintiff also points to evidence from defendants' "Google Ads" report demonstrating that "Studio Nantucket" is one of the top search phrases that results in people being shown defendants' ad.[13]  According to the ad results, 797 searches for "Studio Nantucket" produced defendants' website as a result, with 58 of those searches resulting in someone clicking on the link.  It is impossible to determine how many of those searches were made by individuals who were in fact looking for plaintiff's website, as opposed to information about other businesses on the island (including other fitness studios, art studios, or even defendants' business).  Still, that evidence suggests that there are likely some consumers who did not immediately find the information they were looking for when searching for plaintiff's business.

Nevertheless, the overall evidence of actual confusion is relatively thin, and therefore, this factor does not weigh heavily in favor of plaintiff.

## 5.   Defendants' Intent in Adopting Mark

The bad faith of the alleged infringer in adopting its mark may be relevant to the likelihood of confusion analysis.  *Boston Duck Tours*, 531 F.3d at 25-26.  "Bad faith differs from 'willfulness,' which arises when an infringer proceeds despite knowledge of the senior user's trademark."  *Visible Sys. Corp. v. Unisys Corp.*, 551 F.3d 65, 75 (1st Cir. 2008).  "While willfulness may be relevant to damages after a finding of infringement, only bad faith is relevant

---

[13] The "ad" in this context is generally a link to the website of the entity that pays to be associated with a given keyword.  It generally appears at the top of the search result page.

to a likelihood of confusion." *Cue,* 2016 WL 4074134, at *8. "Bad faith requires proof that one party intended to capitalize on the holder's reputation/goodwill and confusion between the marks." *Unleashed Doggie Day Care*, 828 F. Supp. 2d at 395.

The sole piece of evidence presented by plaintiff in support of a finding of bad faith is that defendants "falsely" represented that Nantucket Studio was founded a year before plaintiff's business by including "Est. 2015" on some of its gear. Defendants assert that the inclusion of "2015" on its gear is not a misrepresentation, because Pizzi began freelance work in 2015 before founding the company. Furthermore, defendants contend that they were unaware of the "Studio Nantucket" mark when they formed their enterprise. Even if they were aware of plaintiff's business, there is no evidence that defendants intended to confuse consumers or gain an advantage by using the 2015 date.

Therefore, this factor weighs in defendants' favor.

### 6.   Strength of Studio Nantucket's Mark

"Under the Lanham Act[,] strong marks enjoy the greatest protection against infringement." *International Ass'n of Machinists*, 103 F.3d at 206 (finding service mark "robust" because it had been registered and widely promoted for more than thirty years). In the First Circuit, courts assess the strength of a mark by analyzing (1) the length of time it has been used and the plaintiff's renown in the field; (2) the strength of the mark in the field; and (3) the plaintiff's actions in promoting its mark. *Riverbank, Inc. v. River Bank*, 625 F. Supp. 2d 65, 75 (D. Mass. 2009); *see also Attrezzi*, 436 F.3d at 40 (noting that the factors relevant to the strength analysis concern practical matters and not the legal classification—generic, descriptive, distinctive, etc.—of the mark).

Plaintiff has only been using its mark since 2016. Its business has a single location and a clientele limited to residents and visitors of Nantucket. And while it engages in local and online

advertising, it is unclear how much those efforts have contributed to consumer recognition of its mark or dress.  Although the travel blogs and magazine articles covering plaintiff's business indicate recognition outside the Nantucket community, plaintiff does not appear to be so well-established as to be "a leader in the industry."  *Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 222 (1st Cir. 1989) (strong mark had been used continuously for over sixty years); *see also Boston Duck Tours*, 531 F.3d at 29 ("Boston Duck Tours" design mark had widespread recognition and continued use in the Boston area for over a decade); *Borinquen*, 443 F.3d at 121 (Borinquen's mark was strong in part because it had been registered for more than three decades); *Boston Athletic Ass'n*, 867 F.2d at 32 (BAA's broad media exposure made it known to the public, which increased its strength).[14]

In sum, plaintiff's mark does not appear to be especially strong.

### 7.   Analysis of the Factors

Weighing all of the factors together, plaintiff has not shown that there is a disputed issue of material fact concerning the likelihood of consumer confusion.  It is true that the parties' logos have some resemblance, and that the similarity of their marks leads to some overlap in online advertising results.  However, plaintiff and defendants provide unrelated services in different channels of trade to distinct classes of prospective buyers.  No reasonable consumer is likely to mistakenly purchase defendants' digital marketing services while looking to attend one of plaintiff's fitness classes.  Further, plaintiff has provided minimal evidence of actual confusion contributing to a loss of customer goodwill or control over its branding.  And plaintiff's brand is

---

[14] Defendants point to other fitness enterprises in Nantucket that have combined the words "Nantucket" and "studio" in their advertising and branding to suggest that plaintiff's mark is weak.  For example, "Forme Barre Fitness" refers to their Nantucket location as "The Nantucket Studio."  (Dkt. No. 27, Ex. C).  "[U]se of similar marks by third-party companies in the relevant industry weakens the mark at issue."  *Cue, Inc.*, 2016 WL 4074134, at *10.  The use of language in advertising copy, however, is not the same as adopting the same mark; therefore, that fact does not carry much weight.

not so well-established as to warrant widespread recognition of its mark.  While none of those factors are independently determinative, viewing the record as a whole, no reasonable jury could find a substantial likelihood of confusion among the consuming public.

Accordingly, summary judgment on the federal and state trademark claims will be granted.

## IV.   Defendants' Motion for Summary Judgment on the Chapter 93A Claim

Count 5 alleges that defendants engaged in unfair methods of competition and unfair and deceptive acts or practices in trade or commerce, in violation of Mass. Gen. Laws ch. 93A, § 2. That claim is based on the actions underlying the trademark claims.  Although defendants have moved for summary judgment on Count 5, neither party has provided briefing.

Nevertheless, in light of the Court's dismissal of plaintiff's infringement claims, there is no basis for concluding that defendants' acts were "immoral, unethical, oppressive, or unscrupulous."  *Black Dog Tavern Co. v. Hall*, 823 F. Supp. 48, 60 (D. Mass. 1993) (quoting *Pump, Inc. v. Collins Mgmt., Inc.*, 746 F. Supp. 1159, 1173 (D. Mass. 1990)); *see also Bayshore Grp. Ltd. v. Bay Shore Seafood Brokers, Inc.*, 762 F. Supp. 404, 415 (D. Mass. 1991) (finding no basis for a Chapter 93A claim where there was no likelihood of confusion).

Accordingly, summary judgment on the Chapter 93A claim will be granted.

## V.   Conclusion

For the foregoing reasons, the motion for summary judgment by defendants Nantucket Studio, LLC and Vincent Pizzi is GRANTED on all counts.

28

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  August 11, 2023                    Chief Judge, United States District Court